45 A.3d 348

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LEROY MUNROE, DEFENDANT–APPELLANT.

Argued March 13, 2012—Decided June 27, 2012.

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Lynne G. Seborowski,* Assistant Prosecutor, argued the cause for respondent (*Edward J. De Fazio,* Hudson County Prosecutor, attorney).

Justice ALBIN delivered the opinion of the Court.

We must determine whether the trial court erred by not allowing defendant Leroy Munroe to withdraw his guilty plea before sentence. The ultimate issue is whether withdrawal of the guilty plea would have been in the interests of justice. *See R.* 3:9–3(e).

Defendant pled guilty to aggravated manslaughter, admitting at his plea hearing that he shot and killed Christian Natal. Shortly thereafter, defendant told the author of his presentence investigation report that he shot Natal because Natal attacked him with a knife. Before sentencing, defendant moved to withdraw his guilty plea, asserting that he acted in self-defense when he was backed up against a car by a knife-wielding Natal. The trial court did not accept defendant's asserted justification for the use of deadly force and rejected his plea-withdrawal motion. The Appellate Division affirmed.

We now reverse, finding that defendant satisfied the necessary factors set forth in *State v. Slater,* 198 *N.J.* 145, 157–58, 966 *A.*2d 461 (2009), for withdrawal of a guilty plea at the presentence stage. In particular, we conclude that defendant articulated a colorable claim of innocence based on a plausible defense and that there would not have been undue delay or prejudice had the case proceeded to trial. The factual issues in dispute identified by the trial court should have been decided by a jury. Accordingly, we remand to give defendant the opportunity for a jury trial.

I.

A.

In September 2005, defendant was charged in a Hudson County indictment with murder, *N.J.S.A.* 2C:11–3(a)(1) or (2); two counts of third-degree unlawful possession of a handgun, *N.J.S.A.* 2C:39–5(b); and two counts of second-degree possession of a handgun with the purpose to use it unlawfully against another, *N.J.S.A.* 2C:39–4(a).

On March 1, 2007, defendant entered into a negotiated plea agreement with the State. Defendant agreed to plead guilty to a lesser-included offense to murder—first-degree aggravated manslaughter, *N.J.S.A.* 2C:11–4(a)(1)—in exchange for the State dismissing the murder count and other charges and capping the maximum sentence at twenty-years imprisonment, subject to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2. That day, defendant appeared before a Superior Court judge, and the terms of the plea were placed on the record. In accordance with *Rule* 3:9–2, the trial court questioned the twenty-one-year-old defendant, under oath, to ensure that he was entering the guilty plea voluntarily and with a full understanding of his rights.

As necessary under *Rule* 3:9–2, the court also directed that defendant give a factual basis to support his plea to aggravated manslaughter. Defendant then engaged in the following colloquy with his counsel:

[DEFENSE COUNSEL]: Leroy, on May 13th of 2005 in the City of Jersey City and particularly at Delaware and Duncan Avenue[s] did you have an altercation with a gentleman by the name of Christian Natal (phonetic)?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And as a result of that altercation—and when I say altercation I mean a verbal dispute. Did you guys have a bit of a verbal discussion, a verbal disagreement—

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]:—on that day? And—and at some point on this day following the verbal altercation did you fire a handgun?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And as a result of firing that handgun did you shoot Christian Natal?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And later on was Christian pronounced dead by the EMS people?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And you knew that he was pronounced dead. Is that correct?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And when you discharged the weapon were you in close proximity to Christian?

[DEFENDANT]: Yes.

[DEFENSE COUNSEL]: And did you fire the weapon in his direction?
[DEFENDANT]: Yes.

At that point, the prosecutor attempted to ask defendant a follow-up question, "I think that's—you agree it's circumstances manifesting—," but instead defense counsel interjected, "Absolutely ... I would stipulate that it's circumstances manifesting extreme indifference to human life. It was close range." The court then indicated that it was satisfied that defendant had entered a knowing and voluntary guilty plea.[1] The court scheduled sentencing for April 20, 2007.

## B.

For the preparation of a presentence investigation report, a probation officer interviewed defendant sometime before April 18, 2007.[2] During the interview, defendant gave the following account, as described in the presentence report. Before May 13, 2005, defendant and his friends were selling "weed" from the corner of Delaware and Duncan Avenues in Jersey City. Natal and his friends robbed defendant and his cohorts of "their drug money and cell phones." Defendant explained that he was robbed more than once by Natal. Because of the robberies and because he "felt his life was threatened by [Natal]," defendant armed himself with a gun. On the day in question, at the above street corner, defendant was talking to Natal when Natal "pulled out a knife on him." Defendant, who had a gun in his jacket pocket, backed up

---

[1] A defendant is guilty of aggravated manslaughter if he "recklessly causes death under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11–4(a)(1). "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." *N.J.S.A.* 2C:2–2(b)(3).

[2] The submission of a presentence report to the court is mandated by both *N.J.S.A.* 2C:44–6 and *Rule* 3:21–2. In particular, *N.J.S.A.* 2C:44–6(a) provides that "[t]he court shall not impose sentence without first ordering a presentence investigation of the defendant and according due consideration to a written report of such investigation when required by the Rules of Court."

while Natal was swinging the knife at him. At a point when defendant was leaning on a car, he shot Natal in the stomach, purportedly, in "self defense." Defendant then fled the scene.

Nothing in the presentence report, which also gave the State's version of events, directly contradicted defendant's account. Indeed, at the scene, the police turned over Natal's body, lying face down on the pavement, and found a box cutter in his hand.

## C.

On sentencing day, October 5, 2007, defendant appeared in court represented by a new attorney.[3] Before sentencing, counsel advised the court that defendant wanted to withdraw his guilty plea because of "certain misrepresentations made by" his former attorney and because he believed "he had a viable affirmative defense of self-defense." [4]

The court reviewed the plea transcript with defendant, and stated, "You had a firearm, he didn't have a firearm." Defendant replied, "He had a knife." The court then placed defendant under oath and engaged in a lengthy colloquy with him.

Defendant generally explained that Natal came at him "real close" with a knife in his hand, that as he backed up he had no line of retreat because he was "in between cars," and that he then pulled a gun from his pocket. This exchange followed:

THE COURT: So you—rather than run away, move away, do anything else you pull out a gun and shot?

[DEFENDANT]: We was in—we was in between the cars. I tried to pull out to let him know like to back up and—

[DEFENSE COUNSEL]: Judge, excuse me, Your Honor. Your Honor is getting onto a point that I've discussed with Mr. Munroe and that is those circumstances that come into play that would allow an individual—affirmative defense of self-

---

[3] For reasons not explained in the record, the original sentencing date was postponed for more than five months.

[4] The alleged misrepresentations by former counsel concerned defendant's sentence exposure and are not germane to this appeal.

defense, one of those elements is that the individual must retreat to a point where he can retreat no longer. And he is entitled to exercise reasonable force—in defense of his own person.

THE COURT: Right. I think what I was getting at during the questioning was that you didn't try to back up, you went right into the aggressive mode.

[DEFENDANT]: *There's nowhere I could go.* We were in between—

[PROSECUTOR]: Judge, just—this is completely different than what the State's witnesses say.

. . . .

THE COURT: But you're between cars. Why couldn't you back up?

[DEFENDANT]: If I'm standing right here and he's standing right there, it's just like this, I'm standing—

THE COURT: *Was your back to the wall?*

[DEFENDANT]: *Yes.*

THE COURT:—back to the wall?

[DEFENDANT]: I—onto the car.

THE COURT: Well—

[DEFENDANT]: *My back was on the car.*

THE COURT: Well—

[DEFENDANT]: I'm like this—*I can't go nowhere. We're talking in between cars.*

THE COURT: *You're—you can't go to the right or you can't go to the left[?].*

[DEFENDANT]:—[unintelligible] *have a knife in his hand*—

THE COURT: Well, what—what you have is circumstances where reasonable jurors could believe that you should have backed up, you should have walked away, you should have run away and you didn't. So the likelihood, the likelihood of you winning on a self-defense was next to nothing. And it's—it's an imperfect self-defense. You have no right to use deadly force unless you cannot possibly get away.

[DEFENDANT]:—not intending on killing him.

THE COURT: Now—

[DEFENDANT]: *It wasn't intentional.*

THE COURT: Well, that's—that's why it's an ag[gravated] man[slaughter] and not murder. The State took all that into consideration when they offered you the plea. And if you—if you withdrew your plea and the State's witnesses came in more than likely it would be a totally different version than your version. And—

[DEFENDANT]: Their version is the same thing.

THE COURT:—even with your version you had the obligation to move away from the altercation rather than use deadly force. And you didn't do that. Now it may have been from the heat of the moment that you did it and that's why the State went to ag[gravated] man[slaughter] instead of murder.[5]

---

[5] At our request, the Clerk of the Supreme Court compared the official transcript to the videotaped hearing. The Clerk, finding discrepancies between

[ (Emphasis added).]

Despite defendant's claims that he was threatened with a knife and had no ability to retreat, the court refused to accept the possibility that defendant had a "winning" self-defense argument. It also rejected defendant's assertion that his original attorney misrepresented to him his potential sentencing exposure under the plea agreement. Consequently, the court denied defendant's motion to withdraw his guilty plea.

The court then sentenced defendant on the aggravated manslaughter charge to a seventeen-year prison term, subject to the provisions of NERA, and imposed appropriate fines and penalties.

### D.

In an unpublished opinion, the Appellate Division affirmed both the trial court's denial of defendant's motion to withdraw his plea and the sentence imposed.[6] While acknowledging that presentence motions to withdraw a guilty plea should be viewed liberally under the "interests of justice" standard, the appellate panel ultimately concluded that defendant did not meet the four-prong *Slater* test to justify a plea withdrawal.[7] First, the panel found that defendant did not assert "a colorable claim of innocence." The panel came to that conclusion because defendant admitted that he was "actually guilty" at the plea hearing; because of the disparity of the weapons possessed by defendant and Natal, with one having a gun and the other "a mere knife"; and because of "purported[ ] eyewitness rebuttal testimony that the men were not in between

---

the two, submitted a proposed corrected transcript to the parties. The parties did not object to the corrected version, which we quote above. *See generally R.* 2:5–5(a).

[6] For our purposes, a discussion of the panel's review of defendant's sentencing is unnecessary.

[7] *Slater* was decided after the trial court rendered its decision but is applicable to this case because it did not announce a new rule of law. *State v. Hayes*, 205 *N.J.* 522, 541 n. 7, 16 *A.*3d 1028 (2011).

parked cars and defendant would have been able to retreat." [8] Second, in light of defendant's failure to "make a plausible showing of a valid defense," in the panel's view, defendant did not give persuasive reasons for a plea withdrawal. Third, it noted that defendant received the benefit of a negotiated plea. Last, the panel was satisfied that the State would suffer "extreme prejudice" if a plea withdrawal were permitted, given that the "offense was committed five and one-half years ago [and defendant] pled guilty almost four years ago." It presupposed that "[w]itnesses may no longer be available and the State's case may be significantly weakened as a result." [9]

For these reasons, the Appellate Division upheld the denial of the plea-withdrawal motion. We granted defendant's petition for certification. *State v. Munroe*, 207 *N.J.* 188, 23 *A*.3d 413 (2011).

## II.

Defendant contends that, in light of the dictates of *Slater*, the trial court abused its discretion in not granting his request to withdraw his guilty plea. He submits that nothing he said at his plea colloquy, including his admission that he shot Natal at close range, "contradicts or undermines his assertion" at the plea-withdrawal hearing "that he acted in self-defense." As evidence of the consistency of his position, he emphasizes that he "denied culpability for the offense" when interviewed for the presentence report. Moreover, he asserts that he made a "plausible showing" through "credible facts in the record"—such as the weapon found in Natal's hand—to support a valid defense that might have led to an acquittal or conviction to a lesser degree of manslaughter. Finally, he argues that the measurement of prejudice to the State must be calculated as of the date of the plea-withdrawal hearing.

---

[8] The panel did not identify who was prepared to offer that testimony. The "State's version of events" in the presentence report does not give this account.

[9] It also bears mentioning that the panel dismissed, as without basis, defendant's claim that his former attorney misled him about his sentence exposure.

In contrast, the State maintains that the trial court properly exercised its discretion in denying the plea-withdrawal motion. The State insists that defendant was not entitled to relief because "[t]he facts of the case would not have supported a claim of self-defense" and because "[u]ndoubtedly, the overwhelming evidence the State was prepared to present serves to rebut any assertion of innocence." Last, the State asserts that it would be prejudiced if it were required to prosecute defendant "[five] years since the offense was committed" and more than three years since the entry of the plea and sentence.

We now turn to the law governing motions to withdraw a guilty plea before sentencing and, in particular, to the *Slater* factors that are intended to give guidance to our courts in resolving such motions.

## III.

### A.

■ Our courts are instructed to apply different standards to a defendant's motion for withdrawal of a guilty plea made before sentence and after sentence. Before sentencing, a "defendant shall be permitted to withdraw" a guilty plea if "the interests of justice would not be served by effectuating the [plea] agreement." *R.* 3:9–3(e). On the other hand, after sentencing, a guilty plea may not be withdrawn except "to correct a manifest injustice." *R.* 3:21–1. Understandably, the interest in finality is greater after sentence and entry of a judgment of conviction, and thus the standard for withdrawing a guilty plea is more onerous. *See Slater, supra,* 198 *N.J.* at 155, 160, 966 *A.*2d 461.

■ A more relaxed standard applies to plea-withdrawal motions made before sentencing. In such cases, "courts are to exercise their discretion liberally to allow plea withdrawals." *Id.* at 156, 966 *A.*2d 461. Indeed, "[i]n a close case, the 'scales should usually tip in favor of defendant.'" *Ibid.* (quoting *State v. Taylor,* 80 *N.J.* 353, 365, 403 *A.*2d 889 (1979)). However, "[l]iberality in

exercising discretion does not mean an abdication of all discretion," *id.* at 157, 966 *A.*2d 461 (quoting *State v. Smullen,* 118 *N.J.* 408, 416, 571 *A.*2d 1305 (1990)) (internal quotation marks omitted), and, accordingly, any plea-withdrawal motion requires a fact-specific analysis, *id.* at 155, 966 *A.*2d 461.

In moving to withdraw a guilty plea, the defendant bears the burden of presenting a "plausible basis for his request" and a good-faith basis for "asserting a defense on the merits." *Id.* at 156, 966 *A.*2d 461 (quoting *Smullen, supra,* 118 *N.J.* at 416, 571 *A.*2d 1305) (internal quotation marks omitted). The authority to grant a plea withdrawal is vested in the sound discretion of the court. *Id.* at 157, 571 *A.*2d 1305. In *Slater,* Chief Justice Rabner distilled "some common principles" from our plea-withdrawal jurisprudence and identified four factors that courts should "consider and balance" in deciding a motion for withdrawal of a plea. *Id.* at 157–58, 966 *A.*2d 461. Those factors are:

(1) whether the defendant has asserted a colorable claim of innocence;

(2) the nature and strength of defendant's reasons for withdrawal;

(3) the existence of a plea bargain; and

(4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused.

[*Ibid.*]

A colorable claim of innocence is one that rests on "particular, plausible facts" that, if proven in court, would lead a reasonable factfinder to determine the claim is meritorious. *See id.* at 158–59, 966 *A.*2d 461. It is more than "[a] bare assertion of innocence," *id.* at 158, 966 *A.*2d 461, but the motion judge need not be convinced that it is a winning argument because, in the end, legitimate factual disputes must be resolved by the jury.

The nature and strength of a defendant's reasons for withdrawal of a plea will necessarily depend on the circumstances peculiar to the case. The timing of the assertion of innocence and withdrawal motion is certainly one consideration, and because presentence withdrawal motions will often be made within a relatively short period after entry of the plea, a "lesser showing is

required" as compared to such motions filed after sentencing. *Id.* at 160, 966 *A.*2d 461. A defendant will likely satisfy this factor if he can make a "plausible showing of a valid defense against the charges" and credibly explain why an otherwise legitimate defense was overlooked during the plea colloquy. *See id.* at 159–60, 966 *A.*2d 461. A court should evaluate the validity of the reasons given for a plea withdrawal with realism, understanding that some defendants will be attempting to game the system, but not with skepticism, for the ultimate goal is to ensure that legitimate disputes about the guilt or innocence of a criminal defendant are decided by a jury. *See id.* at 160, 966 *A.*2d 461.

■ The factor that receives the least weight in the overall analysis is whether the plea was entered pursuant to an agreement with the State. *See id.* at 160–61, 966 *A.*2d 461. Although this factor should not be discounted, for our system "rests on the advantages both sides receive from" the plea-bargaining process, "[w]e recognize that the vast majority of criminal cases are resolved through plea bargains." *Id.* at 161, 966 *A.*2d 461.

■ The final factor is whether a plea withdrawal would unfairly prejudice the State. "The critical inquiry ... is whether the passage of time has hampered the State's ability to present important evidence." *Ibid.* Thus, the trial court must consider the delay to the State in presenting its case to the jury because of the plea-withdrawal motion. On appellate review, the issue is whether the trial court properly exercised its discretion at the time it denied the withdrawal motion. Therefore, in calculating any lost opportunity to the State, ordinarily we look to the intervening time between the entry of the plea and the hearing on the withdrawal motion. That is because if the withdrawal motion is granted, the State can presumably proceed with a trial shortly thereafter. A defendant should not be penalized by the delay caused by a trial court error in not granting a valid withdrawal motion.

## B.

Applying those factors, we granted relief to the defendant in *Slater* whose presentence plea-withdrawal motion was denied by the trial court and affirmed by the Appellate Division. *Id.* at 150, 966 *A.*2d 461. Slater—in accordance with an agreement with the State—pled guilty to second-degree possession with intent to distribute cocaine. *Id.* at 152, 966 *A.*2d 461. The basis for the charge was a cache of drugs found by police in a hotel room where Slater had been visiting. *Id.* at 151, 153, 966 *A.*2d 461. We determined that Slater's motion to withdraw his guilty plea before sentencing should have been granted because he "presented specific, potentially plausible facts" of his innocence. *Id.* at 162–65, 966 *A.*2d 461. Those "potentially plausible facts" were based on his assertions that "he was just visiting the motel room where the cocaine was found, that the room was registered to another person, and that he had no knowledge or control of the drugs." *Id.* at 162–63, 966 *A.*2d 461. Moreover, Slater asserted his innocence claim both "in a pro se motion he filed twelve days after the plea hearing" and in remarks he made for inclusion in the presentence report. *Id.* at 163, 966 *A.*2d 461.

Significantly, "nothing in the record conflict[ed] with Slater's account." *Ibid.* Slater contended that the motel room was not registered to him, and the State offered no evidence at the plea-withdrawal hearing to contradict that claim. *Ibid.* An additional consideration in our decision was that the State did not "articulate[ ] any prejudice beyond the ordinary trial preparation required of it." *Id.* at 164, 966 *A.*2d 461. We specifically noted that any prejudice to the State was properly measured as of the withdrawal hearing date, and that there was "no suggestion that Slater would receive an unfair advantage from the withdrawal of his plea." *Ibid.* Finally, it bears mentioning that we could not "conclude that enforcing the plea agreement" outweighed the factors that favored granting the withdrawal motion. *Ibid.* Therefore, Slater was "entitled to withdraw his guilty plea in the interests of justice." *Id.* at 165, 966 *A.*2d 461.

We now apply the *Slater* test to the facts in this case.

## IV.

First, defendant presented to the trial court a colorable claim of innocence. Nothing in the plea colloquy contradicted defendant's later assertion that he was acting in self-defense. During that colloquy, defendant admitted to shooting Natal at close range with a gun, but when the prosecutor attempted to ask defendant whether he acted under circumstances manifesting extreme indifference to human life, defense counsel interjected that *he*—counsel—stipulated to that element of aggravated manslaughter. Typically, courts must be "satisfied from the lips of the defendant that he committed the acts which constitute the crime." *Id.* at 155, 966 *A.*2d 461 (quoting *Smullen, supra,* 118 *N.J.* at 415, 571 *A.*2d 1305) (internal quotation marks omitted). Permitting a complete response from the defendant that elicits the underpinnings of the guilty plea may take a few more seconds or minutes. Yet, in the long run, that approach may prove more beneficial and less time consuming because it is better to know then whether the defendant has a potentially valid defense and whether he is willing to waive it and enter a guilty plea.

As in *Slater,* not a word that defendant uttered in court during his plea colloquy was inconsistent with either the account that he gave to the probation officer who prepared his presentence report or his sworn testimony when he moved to withdraw his guilty plea. On both of those latter occasions, defendant stated that Natal, who had robbed him in the past, had come at him wielding a knife. At the plea-withdrawal hearing, defendant averred that he backed up until he could no longer retreat, saying, "[t]here's nowhere I could go," "[m]y back was on the car," and Natal had "a knife in his hand."

Although the prosecutor indicated that defendant's account was "completely different than what the State's witnesses say," she made no specific representations and offered no written statements about precisely what they would say. Additionally, the

"State's version of events" in the presentence report did not undermine defendant's self-defense claim.

The trial court was dismissive of defendant's self-defense claim because of the disparity in weaponry—Natal was armed with a knife while defendant was armed with a gun. But under our law, a knife is a deadly weapon "readily capable of lethal use or of inflicting serious bodily injury." *N.J.S.A.* 2C:39-1(r).[10] Knives are commonly used in causing deaths and serious bodily injuries. *See* N.J. State Police Uniform Crime Reporting Unit, *Crime in New Jersey 2010* 24, 33 (2010) (noting that fourteen percent of murders and twenty-three percent of aggravated assaults were committed using knives or cutting instruments). A jury could potentially find that defendant was justified in using deadly force, even though he was armed with a gun, provided defendant was not the initial aggressor and he "reasonably believe[d] that [deadly] force [was] necessary to protect himself against death or serious bodily harm." *See N.J.S.A.* 2C:3-4(b)(2). Moreover, imperfect self-defense is applicable if the jury determines that defendant acted with an honest but unreasonable belief in the need to use deadly force. *State v. Bowens,* 108 *N.J.* 622, 628, 532 *A.*2d 215 (1987). In such circumstances, a jury could return a verdict of reckless manslaughter. Generally, "if any evidence raising the issue of self-defense is adduced, either in the State's or the defendant's case, then the jury must be instructed" on self-defense. *State v. Kelly,* 97 *N.J.* 178, 200, 478 *A.*2d 364 (1984). Indeed, once self-defense is raised in a case, the State must prove beyond a reasonable doubt that defendant was not justified in using deadly force. *Ibid.*

The issue is not whether in the mind of the trial court "the likelihood of [defendant] winning on a self-defense was next to nothing." Rather, the issue is whether defendant raised a colorable claim of innocence that should rightly have been decided by a jury. As in *Slater,* defendant "presented specific, potentially

---

[10] No one disputes that a box cutter is a knife covered by *N.J.S.A.* 2C:39–1(r).

plausible facts" of his innocence. *See Slater, supra,* 198 *N.J.* at 162–63, 966 *A.*2d 461.

The second *Slater* factor—defendant's "primary reason for attempting to withdraw [his] plea [—] dovetails with his assertion of innocence." *See id.* at 163, 966 *A.*2d 461. Here, as in *Slater,* defendant's account at the plea-withdrawal hearing found support in the record. *See ibid.* Defendant claimed that Natal attacked him with a knife, and the police found a box cutter in Natal's dead hand. In short, defendant made a "plausible showing of a valid defense against the charges" and the failure to elicit a full factual basis from the defendant's own lips is a credible reason why self-defense was overlooked during the plea colloquy. *See id.* at 160, 966 *A.*2d 461.

We now turn to the fourth *Slater* factor and will address the third one last. The critical question raised in the fourth factor is whether the State would have suffered unfair prejudice or defendant would have gained an unfair advantage had the trial court granted withdrawal of the plea. As in *Slater,* any prejudice to the State must be measured as of the time of the plea-withdrawal hearing date. *See id.* at 164, 966 *A.*2d 461. Here, defendant entered his plea on March 1, 2007; the presentence report detailing defendant's self-defense claim is dated April 18, 2007; defendant's original sentencing date was set for April 20, 2007; and the withdrawal motion was heard on October 5, 2007. The State made no assertion that, as of October 5, "the passage of time ha[d] hampered [its] ability to present important evidence" or that there was "the loss or deterioration of key evidence." *See id.* at 161, 966 *A.*2d 461. There has been no showing that defendant somehow gained an advantage during the interval between the entry of his plea and the plea-withdrawal hearing.

Finally, the third factor—whether defendant's plea was part of a plea agreement—must be viewed in light of the other three factors, all of which favor withdrawal of the plea. It is commonly known that the vast majority of all cases are resolved

through plea agreements with the State. In the circumstances of this case, this factor does not outweigh the other three factors.

We understand that the trial court did not have the benefit of *Slater* at the time it considered the plea-withdrawal motion. However, the underlying precepts that inform the *Slater* test come directly from pre-existing case law. *Id.* at 157, 966 *A.*2d 461. We conclude that a proper balancing of the appropriate factors should have led the trial court to allow defendant to withdraw his guilty plea "in the interests of justice." *Id.* at 165, 966 *A.*2d 461. In short, the trial court mistakenly exercised its discretion in denying the withdrawal motion. *See State v. Koedatich,* 112 *N.J.* 225, 313, 548 *A.*2d 939 (1988) (explaining that trial court commits abuse of discretion when "there has been a clear error of judgment").

## V.

For the reasons expressed, we reverse the judgment of the Appellate Division, which affirmed the trial court's denial of defendant's motion to withdraw his guilty plea. Defendant should have been permitted to withdraw his plea and have his self-defense claim decided by a jury. We therefore remand for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER, and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.